1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
9                                   AT TACOMA

10   ELEANOR DUDA, o/b/o ANTHONY
     DUDA (deceased),                              CASE NO.    C08-5582BHS-KLS
11
                           Plaintiff,              REPORT AND
12                                                 RECOMMENDATION
            v.
13                                                 Noted for July 31, 2009

14   MICHAEL J. ASTRUE, Commissioner of
     Social Security,
15
                           Defendant.
16

17

18

19          Plaintiff, Eleanor Duda, on behalf of Anthony Duda, has brought this matter for judicial review of

20   the denial of Anthony Duda's applications for disability insurance and supplemental security income

21   ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

22   § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>,

23   423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned

24   submits the following Report and Recommendation for the Court's review.

25                              <u>FACTUAL AND PROCEDURAL HISTORY</u>

26          Mr. Duda was 48 years old[1] when he died of acute methadone toxicity on August 2, 2005. Tr. 26,

27   _____

28          [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

     REPORT AND RECOMMENDATION
     Page - 1

37. He had a high school education and past work experience as a telemarketer, timber laborer/stacker and flagger. Tr. 164, 169, 179, 200, 205, 604.

On December 18, 2001, Mr. Duda filed an application for SSI benefits, and on January 9, 2002, he filed one for disability insurance benefits, alleging disability as of May 31, 1998, due to a bipolar disorder, depression and a substance abuse disorder. Tr. 17-18, 140-45, 163, 541-42. His applications were denied initially and on reconsideration. Tr. 17, 37-39, 61, 65, 69, 543-44, 548-49. On September 2, 2004, a hearing was held before an administrative law judge ("ALJ"), at which Mr. Duda, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 571-608.

On November 2, 2004, the ALJ issued a decision in which he determined Mr. Duda to be not disabled, finding specifically that Mr. Duda was capable of performing other jobs existing in significant numbers in the national economy. Tr. 43-55. On June 12, 2005, the Appeals Council granted Mr. Duda's request for review, remanding the matter for further consideration of the medical evidence in the record, Mr. Duda's residual functional capacity, both with and without the effects of substance abuse, and his ability to perform other jobs existing in significant numbers in the national economy. Tr. 119-21.

As noted above, Mr. Duda died on August 2, 2005, due to acute methadone toxicity. On February 3, 2006, a supplemental hearing was held before the same ALJ, at which Mr. Duda's attorney appeared and testified on behalf of Mr. Duda, and at which a different vocational expert appeared, but did not testify. Tr. 609-19. On April 25, 2006, the ALJ issued a second decision, once more determining Mr. Duda to be not disabled, this time finding specifically in relevant part:

    (1)    at step one of the sequential disability evaluation process,[2] Mr. Duda had not engaged in substantial gainful activity since his alleged onset date of disability;

    (2)    at step two, Mr. Duda had "severe" impairments consisting of a personality disorder and a substance abuse disorder;

    (3)    at step three, Mr. Duda's impairments met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), § 12.09, but without his substance abuse disorder, none of Mr. Duda's impairments met or equaled the criteria of any of those contained in the Listings;

    (4)    after step three but before step four, not considering his substance abuse disorder, Mr. Duda had the residual functional capacity to perform work at all

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

exertional levels, which required no public contact and only limited contact with co-workers and limited supervision;

    (5)    at step four, Mr. Duda was unable to perform his past relevant work; and

    (6)    at step five, Mr. Duda was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 17-34. Plaintiff's request for review of the ALJ's second decision was denied by the Appeals Council on July 29, 2008, making that decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 404.981, § 416.1481.

On September 26, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on January 5, 2009. (Dkt. #9). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

    (a)    the ALJ erred in not finding Mr. Duda's bipolar disorder to be a severe impairment;

    (b)    the ALJ erred in evaluating the medical evidence in the record;

    (c)    the ALJ erred in not finding any of Mr. Duda's mental impairments, absent his substance disorder, met or equaled the criteria of Listing 12.04;

    (d)    the ALJ erred in assessing Mr. Duda's credibility;

    (e)    the ALJ erred in evaluating the lay witness evidence in the record;

    (f)    the ALJ erred in assessing Mr. Duda's residual functional capacity; and

    (g)    the ALJ erred in finding Mr. Duda capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining Mr. Duda to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that Mr. Duda is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than

a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir.

1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than

one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749

F.2d 577, 579 (9th Cir. 1984).

I.    <u>Alcoholism or Drug Addiction as a "Material Contributing Factor"</u>

A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing

factor material to the Commissioner's determination" that the claimant is disabled. <u>Bustamante v.</u>

<u>Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) and 20

C.F.R. § 404.1535(a), § 416.935(a)). To determine whether alcoholism or drug addiction is a materially

contributing factor, the five-step sequential disability evaluation process first must be conducted "without

separating out the impact of alcoholism or drug addiction." <u>Id.</u> at 955. If the ALJ finds the claimant is not

disabled, then he or she "is not entitled to benefits." <u>Id.</u>

If the claimant is found disabled "and there is 'medical evidence of [his or her] drug addiction or

alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she]

stopped using alcohol or drugs.'" <u>Id.</u> (citing 20 C.F.R. § 404.1535, § 416.935). Thus, if a claimant's

current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations

are disabling, "then drug addiction or alcoholism is not material to the disability, and the claimant will be

deemed disabled." <u>Ball v. Massanari</u>, 254 F.3d 817, 821 (9th Cir. 2001).

II.   <u>The ALJ's Step Two Analysis</u>

At step two of the sequential disability evaluation process, the ALJ must determine if an

impairment is "severe." 20 C.F.R. § 404.1520, § 416.920. An impairment is "not severe" if it does not

"significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §

404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181

*1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §

404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

than a minimal effect on an individual[']s ability to work." <u>See</u> SSR 85-28, 1985 WL 56856 *3; <u>Smolen v.</u>

<u>Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996); <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff

has the burden of proving Mr. Duda's "impairments or their symptoms affect[ed] [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found Mr. Duda had severe impairments consisting of a personality disorder and a substance abuse disorder. In addition, the ALJ found as follows:

> The claimant was diagnosed with a bipolar disorder, but this diagnosis does not seem to take into consideration the claimant's substance abuse, or the testing completed by Dr. [Douglas] Campbell. The claimant admitted that he last used crack in 2003, but he died of a drug overdose. This suggests that the claimant may have been abusing substances and that this could be the cause of his reported manic phases. Dr. [Deborah] Haynes had indicated in 2002 that the claimant was sober. She has stated that she treated the claimant monthly in 2002 and less frequently in 2004 and her last treatment was in July of 2004. This would suggest that most of her treatment occurred when the claimant was still using. Many of the evaluations in the record operated on the assumption that the claimant was sober, while the medical record suggests otherwise. In treatment records the claimant had reported episodes of hypomania prior to the session, but the only time he was noted to be manic was immediately prior to his death. Since the claimant died of a drug overdose, it is realistic to expect that the claimant may have been abusing drugs again by the time of his death. I agree with the testimony of the medical expert at the first hearing, and the findings of Dr. Campbell, that the claimant had a personality disorder and a substance abuse disorder.

Tr. 27. Plaintiff argues the ALJ erred in not finding Mr. Duda's bipolar disorder to be a severe impairment here. The undersigned disagrees.

While some of the medical sources in the record have diagnosed Mr. Duda with a bipolar disorder, along with significant mental functional limitations stemming therefrom and not from his substance abuse disorder or other mental impairments, the weight of the medical evidence in the record indicates otherwise. Mr. Duda was evaluated several times between early November 1999, and late January 2000, by Douglas Campell, Ph.D., while serving a prison term. Dr. Campbell found that despite appearing to be depressed, Mr. Duda performed "within normal limits in his cognitive processes." Tr. 270. Dr. Campbell noted that although Mr. Duda had been diagnosed with a bipolar disorder with psychotic features, he denied having both manic and psychotic symptoms. Id. Dr. Campbell found neither of these symptoms were present upon evaluation, and further noted that standardized personality testing suggested "a more personality disordered and substance abuse clinical picture." Id.

While Dr. Campbell did state it was suggested that a bipolar disorder with psychotic features by history "be retained as a principle diagnosis," this solely was because "Mr. Duda may have attempted to

downplay his mental health issues during the evaluation." Id.  What was certain to Dr. Campbell, though, was that "a long history of alcohol and substance abuse" was "very visible" in regard to Mr. Duda, as was "a long history of conduct problems and antisocial tendencies." Id.  Indeed, in regard to substance abuse, Dr. Campbell noted that:

> Mr. Duda's criminal offenses do not appear to have been well planned.  Many seemed to be based on impulsivity secondary to alcohol and/or drug abuse . . .
>
> . . .
>
> Mr. Duda said he first tried marijuana at the age of 13.  He expressed "Nothing wrong with it.  It's good."  He admitted he last used this drug two years ago.  He declined to give any more specific information about his recent use of this substance.  He expressed worry that "the Board will make me go to AA or something."  Throughout this evaluation, Mr. Duda made statements that seemed to be veiled assertions that he would resume marijuana use upon release.  For instance, when directly asked whether he would use marijuana after his release, he stated "Maybe.  Probably not.  I guess I can't do that anymore."
>
> In regards to other substance abuse, Mr. Duda declared that he first used methamphetamines in 1997-1998.  He estimated that he was using approximately ¼ gram every two or three weeks.  He said he last used this substance "the day I got arrested."  He then revealed he first tried cocaine in 1991 and only used it "once or twice."  Reportedly, he last used this substance in 1992.  He first tried LSD in 1974, at the age of 14 or 15, and used this substance once a month for a year.  He last used LSD in 1976 and denied any other substance abuse (i.e., PCP, heroin, crack, hashish, etc.).
>
> Mr. Duda's Substance Abuse Subtle Screening Inventory (SASSI) taken on 11/03/98 indicated: "The decision rules classify him as having a high probability of having a substance dependence disorder.  This client shows marked similarity in response pattern to substance dependent people. . . ."
>
> When asked about life problems stemming from alcohol or drug abuse, Mr. Duda reported that he has experienced depression secondary to alcohol and drug use; has been previously kicked out of his home and forced into treatment by his parents; and incurred many criminal charges.  When asked why he has not been able to get ahead and/or pull his life together, Mr. Duda replied, "A lot of that was alcohol.  It was drinking."
>
> . . .
>
> Mr. Duda was referred for Chemical Dependency Treatment on 2/1/99 and was admitted to a chemical dependency treatment program through the Washington State Department of Corrections on 4/9/99; he was discharged on 7/9/99.  He reentered the program on 7/13/99 and was ultimately discharged from it on 11/30/99.  In a Discharge Summary, dated 12/22/99, Patricia Brixley, CDP, wrote the following
>
>> Pt (patient) was discharged due to non-compliance.  Pt made little progress in treatment.  Pt only motivation appears to have been the opportunity for work release.
>>
>> . . . Pt does not appear to connect negative consequences with chemical use. . . .

. . .

Ms. Brixley listed Mr. Duda's prognosis as "poor due to Pt's lack of progress in treatment."

Tr. 256, 258-59, 263. Dr. Campbell further noted that the interpretation of Mr. Duda's profile produced by standardized testing results indicated the following:

> . . . The configuration of the clinical scales suggests a person with a history of polysubstance abuse, including alcohol as well as other drugs. When disinhibited by the substance abuse, other acting-out behaviors may become apparent as well. The substance abuse is probably causing severe disruptions in his social relationships and his work performance, with these difficulties serving as additional sources of stress and perhaps further aggravating his tendency to drink and use drugs.

> . . . According to the respondent, his use of alcohol has had a negative impact on his life. Alcohol-related problems are likely, including difficulties in interpersonal relationships, difficulties on the job, and possible health complications.

Tr. 267. Lastly, Dr. Campbell opined that "[g]iven his history of disorderly conduct and aggression while under the influence of drugs or alcohol, one could reasonably assume that" Mr. Duda would become "assaultive when disinhibited under the influence" of those substances, and concluded in relevant part with respect to the influence of substance abuse on his functioning and prognosis:

> Mr. Duda . . . reports that his inability to get his life moving in a positive and constructive direction has largely been related to his drinking problem. It is likely that his use of marijuana is also a profound problem as overuse of this substance can lead to low motivation toward life tasks and depression. He appears resistive and unmotivated to substantially dealing [sic] with his alcohol and substance abuse problem. . . .

> . . .

> Mr. Duda gives the impression that he has plans to return to alcohol and marijuana usage after his release. . . .

> Overall, Mr. Duda appeared resistive and poorly motivated during the evaluation. . . . He has between seven and thirteen past attempts at alcohol and substance abuse treatment. His instant offense is the latest of an apparently long-line of alcohol and substance-related offenses. Yet, despite all that, he still does not appear serious about attaining and maintaining sobriety. . . .

> . . . His problem with irritability and modulating his anger, in tandem with the disinhibiting effects of alcohol and drugs, has likely been at the root of his worst criminal behavior. It also appears to pose a threat to his successful transition to and maintenance in a community living situation. . . .

> . . .

> . . . Mr. Duda appears to be significantly at risk for using alcohol and/or drugs and may pose management problems for a work release program due to this risk.

Tr. 269-71.

In late July 2000, Mr. Duda reported he had "a problem with drinking" and drank alcohol "daily for a few weeks prior to incarceration." Tr. 251. However, he did not admit to having used any drugs at that time, contrary to what he had earlier reported to Dr. Campbell. Id. In mid-August 2000, though, Mr. Duda did report both smoking crack cocaine and drinking "12-24 beers" daily. Tr. 247. In early January 2001, he reported last using cocaine that morning, and again reported using crack cocaine later that month. Tr. 336, 410. Also later that month, Mr. Duda reported drinking "2 quarts of liquor" daily. Tr. 336. In early February 2001, Mr. Duda again reported drinking 12-24 beers and using crack cocaine on a daily basis, this time also indicating previous methamphetamine and marijuana use. Tr. 349.

In late February 2001, Mr. Duda was evaluated by Linda Miller, D.O., who diagnosed him with both an anxiety disorder and an antisocial personality disorder, but not with a bipolar disorder. Tr. 292. Of particular note is Mr. Duda's report at the time that his last use of alcohol "was 'months and months ago.'" Tr. 290. In addition, despite his earlier reports to Dr. Campbell, Mr. Duda denied "ever having used street drugs," and reported that "he was not using illicit drugs or alcohol at the time" of the crime for which he was incarcerated, and denied any other "alcohol-related charges." Tr. 290-91.

In early March 2001, Mr. Duda sought "Detox from Etoh, crack [and] Meth.," and stated he had been drinking "6-24 oz beer[s] and using crack." Tr. 400. Mr. Duda reported in mid-March 2001, that he had been "kicked out" of the place where he was living "due to behavior problems following intoxication." Tr. 341. In late March 2001, Mr. Duda again was seen for "detox", at which time he reported his last use of alcohol was just two hours ago. Tr. 397-98. Recent crack use was reported as well. Tr. 398. Also in late March 2001, a psychiatric review technique form was completed by Lance Harris, Ph.D., a non-examining psychologist, who, based on his review of the medical evidence in the record, diagnosed Mr. Duda with an anxiety disorder, a personality disorder and a substance addiction disorder, but did not give any indication that a bipolar disorder was present. Tr. 299, 301-02.

In mid-April 2001, Mr. Duda was noted to be "possibly hungover." Tr. 330. While he admitted to drinking alcohol at the time, he minimized the amount. Tr. 353. In addition, although Mr. Duda stated he had maintained sobriety for three months following his release from incarceration, he acknowledged he then began drinking 10-12 beers and using crack on a daily basis. Tr. 330. In late April 2001, he not only reported that he used cocaine daily and consumed alcohol – which was noted to be an "unknown amount"

1   – but that he also did heroin "two times a week." Tr. 358. Mr. Duda was described as having "a tendency

2   to take" his medication "off and on alternately with doing drugs." Tr. 358-59. Also around that time, he

3   was noted to be in violation of his probation due to use of drugs and alcohol. Tr. 322.

4       Mr. Duda once more returned to jail, where he was noted to be stabilizing and detoxifying in late

5   April 2001, and early May 2001. Tr. 322, 355-56. Annette Lovell, M.A., one of Mr. Duda's mental health

6   treatment providers, completed a psychological/psychiatric evaluation form in early June 2001, in which

7   she gave him a diagnosis of a bipolar disorder and a possible diagnosis of polysubstance dependence. Tr.

8   345. While Ms. Lovell did not feel Mr. Duda's mental health conditions were caused by past or present

9   drug or alcohol use, and stated that he had been abstinent for 60 days, she also noted that drug or alcohol

10  treatment likely would decrease the severity of those conditions. Id. Further, although Ms. Lovell did not

11  think the marked to severe cognitive limitations she found likely were the result of drug or alcohol abuse,

12  she did believe such substances caused his symptoms to "become more severe." Tr. 346.

13      Contrary to Mr. Duda's report of being 60-days abstinent earlier in the month, Ms. Lovell noted in

14  late June 2001, that "[s]taff reported [drug and/or alcohol] use at [the] beginning of [the] month." Tr. 319.

15  In mid-to-late July 2001, Mr. Duda was noted to have shown up intoxicated recently. Tr. 317. In late July

16  2001, he showed up at a hospital emergency room requesting "to 'get into detox,'" and admitting to having

17  used alcohol that day. Tr. 389. His "alcohol Breathalyzer" was noted to be "very high" at the time, and he

18  was assessed with alcohol withdrawal. Tr. 388-89. Ms. Lovell's progress notes indicate substance abuse

19  continued at a fairly high level through early October 2001. Tr. 314, 337-39, 348.

20      While Mr. Duda told one mental health treatment provider on December 4, 2001, that he had not

21  had any alcohol for two months (Tr. 418), two days later he appeared to have told another such provider,

22  Deborah Haynes, M.D., that it had been six months since any use of drugs or alcohol (Tr. 467). In late

23  December 2001, however, Mr. Duda told yet another mental health treatment provider that he had a "31-

24  year history of drug use," and he expressed "mixed emotions about his sobriety." Tr. 416. Specifically,

25  Mr. Duda related that part of him wanted "to relapse and escape reality." Id.

26      Also in late December 2001, he told Philip J. Frank, Ph.D., an examining psychologist, that he had

27  used cocaine and alcohol on and off "for years." Tr. 361. While Dr. Frank did diagnose Mr. Duda with a

28  bipolar disorder, he also diagnosed him with chronic polysubstance abuse. Tr. 362. Indeed, Dr. Frank felt

that Mr. Duda's cognitive limitations were likely the result of drug or alcohol abuse, that those limitations likely would dissipate within 60 days of sobriety, that he would be able to function and work in general if he were clean and sober, and that drug and/or alcohol abuse exaggerated his diagnosed conditions "100%". Tr. 362-63. Although Mr. Duda alleged he had been clean and sober since the previous October, it seems Dr. Frank indicated he felt that allegation to be not particularly credible. See Tr. 364.

In early January 2002, contrary to what he recently told Dr. Haynes, Mr. Duda told another mental health treatment providers that he had been clean and sober for only three months. Tr. 419. He also stated at that time that he had "self-medicated" for "most of his life, especially the past" year. Tr. 414. Mr. Duda was diagnosed with a bipolar disorder, an antisocial personality disorder, and polysubstance dependence in early full remission. Tr. 422. In early March 2002, he was evaluated by Alyssa A. Ruddell, Ph.d., who also diagnosed him with polysubstance dependence and an antisocial personality disorder. Tr. 431. Dr. Ruddell commented that his problems "cooperating with shelter programs and maintaining housing" may have been "sequela of drug/alcohol use, specifically crank." Tr. 428.

When asked specifically about his substance abuse, Mr. Duda told Dr. Ruddell that he "had an on-again off-again drug habit that contributed to his legal problems," that his "drug of choice was marijuana," that he last drank alcohol in the summer of 2000 – even though it was noted that records indicated he lost housing in August 2001, "because of intoxication and assaultive behavior" – and that "he used cocaine and methamphetamines last year." Id. Dr. Ruddell opined that Mr. Duda's "drug/alcohol addictions" seemed to have been "paramount". Tr. 430. As such, she was concerned he would "'ask/demand' lithium and other psychotropic drugs to use in making methamphetamines." Id. In late March 2002, Mr. Duda again told Dr. Haynes he had been clean and sober for the past six months (Tr. 463), and another treatment provider that he had "mixed feelings about being clean and sober" (Tr. 489).

In early April 2002, Charles M. Regets, Ph.D., a non-examining consulting psychologist, completed a psychiatric review technique form, in which he diagnosed Mr. Duda with a bipolar disorder, a personality disorder with borderline features and a substance addiction disorder based on his review of the record. Tr. 438, 442-43. He found Mr. Duda had marked limitations in two general areas of mental functioning, but only in light of his substance addiction disorder. Tr. 445. Otherwise, he had at most moderate limitations in those areas. Id. Dr. Regets also completed a mental residual functional capacity

assessment form at the same time, which later was affirmed by Bruce Eather, Ph.D., in which he found Mr. Duda had a number of more specific moderate to marked mental functional limitations, the majority of which – including all the marked limitations – he felt would be present only as the result of drug use. Tr. 432-34.

Indeed, based on their review of the record, Drs. Regets and Eather felt there were "no consistent signs or symptoms to fully support" a diagnosis of bipolar disorder." Tr. 434. Instead, they found Mr. Duda appeared to have a "personality disorder with immature social capability" that had "resulted in poor social decisions and incarceration," and with respect to which the "[m]ost recent psychological evaluation" indicated the existence of both an "antisocial personality disorder and substance abuse." Tr. 434. Drs. Regets and Eather also opined that given Mr. Duda's "history of self harm[,] the diagnosis of borderline personality disorder" seemed to be "more descriptive." Id.

In late July 2002, however, Dr. Haynes described Mr. Duda as having been clean and sober for the past year. Tr. 513. She diagnosed him with a mixed bipolar affective disorder in partial remission, and found he had a number of moderate to marked mental functional limitations stemming therefrom, but did not find any indications of drug or alcohol abuse in relation thereto. Tr. 514-15. In early November 2002, Mr. Duda reported to one of his mental health counselors that he had been clean and sober for one year as well, and he denied any current substance use, with such use again being denied in early January 2003. Tr. 488, 490. Also in early January 2003, he was diagnosed with both a bipolar disorder and a current global assessment of functioning ("GAF") score of 45,[3] with the highest in the past year being in the range of 55-60,[4] but declined to answer any questions regarding his drug or alcohol use. Tr. 495, 501.

In late January 2003, while Mr. Duda once more was diagnosed with a bipolar disorder, no specific mental functional limitations were noted to be a result thereof, and drugs and alcohol were seen as being a

---

[3]"A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

[4]"A GAF of 51-60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Tagger v. Astrue, 536 F.Supp.2d 1170, 1173 n.6 (C.D.Cal. 2008) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34).

risk factor. Tr. 474-75. He again was given that diagnosis in late March 2003, and reported being clean and sober for over a year at the time. Tr. 483, 487. In late May 2003, however, Mr. Duda stated he had been clean and sober for only 5 days, that he had "some ambivalence about staying" clean and sober, and that he was going to be "kicked out" of his house due to using crank. Tr. 507. In mid June 2003, Mr. Duda reported that he had "faltered and did some drugs a couple of times (crackand [sic] meth)" and "gave a dirty UA [urinalysis]" back in April 2003. Tr. 481. He further reported that one place where he might look for new housing did "not do UA's" and allowed drinking in the apartments, and that his "whole life" was "dedicated to getting high." Id.

Mr. Duda was assessed with a bipolar disorder and a GAF of 35[5] in mid-July 2003, but again drugs and alcohol were listed as a risk factor, and he reported that a "crisis" will "usually" happen when he does not take his medications or when he is "on other drugs." Tr. 473, 476. A bipolar disorder, polysubstance dependence and an antisocial personality disorder were all assessed in late September 2003, but there was no indication of mental functional limitations or the effect of drugs and/or alcohol at that time. Tr. 468. In early June 2004, plaintiff told Dr. Haynes that he had been clean and sober for seven months. Tr. 457. In late July 2004, she provided a written opinion, in which she diagnosed Mr. Duda with a bipolar disorder, alcohol abuse in eight-months remission and a mixed personality disorder with antisocial features. Tr. 450. She found him seriously limited or unable to meet competitive demands in a number of mental functional areas, none of which she opined were caused by drug or alcohol use. Tr. 453-55.

In early September 2004, the medical expert, Norman Gustavson, M.D., testified at the first hearing that based on his review of the record, Mr. Duda had a diagnosis of "intermittent explosive behavior," an attention deficit disorder, polysubstance abuse, and – as the "primary diagnosis" – an antisocial personality disorder, but that there was no evidence of him having a bipolar affective disorder. Tr. 595-96. Mr. Duda told Dr. Haynes in mid-September 2004, that he had been clean and sober since October 2003, that he was "doing much better" now that he was "clean", and that his hypomania was "mostly stable." Tr. 533. She found Mr. Duda's bipolar disorder to be in partial remission, and noted that he was "[r]esponding well to current medication." Id.

---

[5]"A GAF score of 31-40 is extremely low, and 'indicates . . . major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" Salazar v. Barnhart, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting DSM-IV-TR at 32).

A similar report by Mr. Duda and substantially similar findings by Po Karczewski, another mental health treatment provider, were given in early January 2005, as well. Tr. 527. Mr. Karczewski completed a psychological/psychiatric evaluation form at that time, in which he diagnosed Mr. Duda with a bipolar disorder, found a number of moderate to marked mental functional limitations stemming therefrom, and noted there was no indication of drug or alcohol use or abuse. Tr. 520-21. Mr. Duda, who continued to report being clean and sober since October 2003, was found to have a bipolar disorder in partial remission through late July 2005, with only a "[m]ild exacerbation" thereof noted in late June 2005, due to Mr. Duda not taking his medications "for a while." Tr. 523, 525.

On August 2, 2005, however, as noted above, Mr. Duda died of acute methadone toxicity, after he was found to have stolen "an unknown amount" of that drug from his former roommate the night before. Tr. 537, 539. In the medical examiner's report, Mr. Duda was described as having been "off the wall" the previous day while in a Denny's Restaurant, apparently had been "evicted from the premises" thereof "due to his behavior," and, according to his mother, "had been off his medications for an unknown time" prior thereto. Tr. 540. Lastly, the record also contains a supplemental written opinion from Dr. Haynes, dated January 27, 2006, in which she opined, based on her treating relationship with him and her review of other medical records, that Mr. Duda was unable to perform several work-related tasks, the causes of which had been present since childhood, and which was not due to drug or alcohol abuse. Tr. 535-36.

Given the lengthy history of Mr. Duda's on-going mental health issues and problems in maintaining sobriety, the undersigned finds the weight of the medical evidence in the record supports the determination of the ALJ that much, if not all, of plaintiff's mental functional difficulties were due to causes other than a bipolar disorder, such as his personality disorder and substance abuse. That evidence shows Mr. Duda was not consistent in reporting the nature and extent of his drug and alcohol use, and that a number of medical and other treatment sources in the record who diagnosed him with a bipolar disorder, including Dr. Haynes, were not aware of his ongoing substance abuse. Indeed, while, as pointed out by the ALJ, Dr. Haynes saw Mr. Duda most frequently in 2002, and her last treatment of him was in July 2004, he continued to use both drugs and alcohol through at least October 2003. The undersigned also finds the ALJ was not at all remiss in treating Mr. Duda's death, and the events immediately surrounding it, as evidence that his problems with such abuse continued long after Dr. Haynes stopped treating him.

Plaintiff takes issue with the ALJ's determination that Mr. Duda did not have a bipolar disorder, even though he had been diagnosed therewith by Dr. Haynes and had been taking medication for years that is commonly used to treat that disorder. But, as discussed above, although Dr. Haynes did diagnose that condition, as did a few other medical sources in the record, the majority of such sources – including those who evaluated Mr. Duda himself, such as Dr. Campbell, who did so several times – did not, most of whom also noted the strong influence of on-going substance abuse on his functioning. In addition, the mere fact that Mr. Duda was prescribed a medication that is commonly used to treat bioplar disorder, does not mean necessarily that that disorder was severe.

The undersigned also disagrees with plaintiff's assertion that the ALJ's decision is not internally consistent. Plaintiff argues such inconsistency stems from the ALJ's statement that Mr. Duda functioned adequately when he was consistent in taking his medications, again even though the ALJ also found he did not have a bipolar disorder. While one or more of Mr. Duda's medications may be commonly used for bipolar disorder, plaintiff has not actually come forth with any evidence the Court can rely on to find this. Nor did the ALJ specifically limit his findings to treatment of Mr. Duda's alleged bipolar disorder. In any event, even if there is some inconsistency on the ALJ's part here, the fact still remains that for the purposes of step two, as discussed in further detail below, the record shows, as the ALJ found, that Mr. Duda functioned adequately both when taking his medications consistently and when he was clean and sober.

III.     The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a

detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.     Dr. Haynes

As noted above, in late July 2002, Deborah Haynes, M.D., Mr. Duda's treating physician from early December 2001, until early July 2004, completed a psychological/psychiatric evaluation form, in which she diagnosed him with a mixed bipolar affective disorder in partial remission. Tr. 514. Dr. Haynes stated that Mr. Duda had been clean and sober for one year at the time of the evaluation, that there was no indication of alcohol or drug abuse, that the many moderate to marked mental functional limitations with which she diagnosed him most likely were not the result of alcohol or drug abuse, and that medication had

no effect on his ability to perform normal day to day work activities. Tr. 513-15. In addition, Dr. Haynes opined that Mr. Duda had a "life-long" significant impairment with "little to no stress tolerance," and that mental health intervention was not likely to restore or substantially improve his ability to work, although she did note he had decreased irritability and "some stabilization" on medication. Tr. 516.

In late July 2004, Dr. Haynes filled out a mental residual functional capacity questionnaire, in which she diagnosed Mr. Duda with a bipolar disorder, a mixed personality disorder with antisocial features and alcohol abuse in remission for eight months. Tr. 450. Dr. Haynes opined that Mr. Duda had a number of work-related mental functional limitations in the "[s]eriously limited, but not precluded" and "[u]nable to meet competitive standards" categories, that he had "an extraordinary problem with social interactions," and that, again, he had "low stress tolerance." Tr. 453-54. Specifically, Dr. Haynes stated that Mr. Duda's "[p]oor social skills, low stress tolerance and irritability" were "a serious drawback" to his "ability to find and maintain work," and that "[r]elating to the public on a regular basis would not be possible." Tr. 455. In addition, Dr. Haynes did not feel Mr. Duda's impairments were caused by his use of drugs or alcohol, and believed he would miss more than four days of work per month. Id. On the other hand, she did think that Mr. Duda was "much less volatile" with "fewer mood swings" on medication. Tr. 450.

The record also contains a "Supplemental Treating Source Statement in Respect to Functional Limitations" completed by Dr. Haynes in late January 2006. Tr. 535-36. In that statement, Dr. Haynes indicated that she last treated Mr. Duda in July 2004, but that she would not change any of the limitations she noted in the late July 2004 form she completed. Tr. 535. She further opined that Mr. Duda would not have been able to meet "competitive standards" in regard to working and getting along with co-workers and supervisors, that his problems in those areas had been present for him since childhood, and that they pre-dated, and therefore were not caused by, his alcohol and drug abuse. Tr. 535-36.

In regard to Dr. Haynes's mid-July 2002, and late July 2004 opinions, the ALJ noted in relevant part that:

> Dr. Haynes [sic] treatment notes show that the claimant was not in treatment between September of 2002 and January 22, 2004. In January of 2004 the claimant reported that he had just been released from long term drug and alcohol treatment. She noted that the claimant had been doing well on a combination of Zoloft and lithium. In July of 2004, the claimant was noted to be living in a trailer and sharing a bathroom with the landowner. She noted that the claimant's last jail time was in 2002 before he had

treatment (Exhibit 16F, p. 1). The claimant saw Dr. Haynes four times in 2004. In 2002, Dr. Haynes [sic] treatment notes indicate no knowledge of current substance use, even though the claimant did not achieve sobriety until October of 2003. . . .

Tr. 24.[6] With respect to the late January 2006 opinion Dr. Haynes provided, the ALJ found in relevant part as follows:

. . . Clearly, any opinion that the claimant was unable to function since first grade was not based on her own examinations or any treatment records dating back to that time. She said that the claimant had been unable to get along with others since first grade, but did not address how he had a friend who accompanied him to an evaluation or how he managed to live in trailers on other people's property. Additionally, the claimant had consistently demonstrated that he had been able to work when he desired to for years.

Tr. 26. In terms of both that opinion and the two earlier ones Dr. Haynes gave, the ALJ further commented in relevant part:

. . . I note that Dr. Haynes had a limited treatment relationship with the claimant, most of it before the claimant achieved any level of sobriety. She indicated in her 2006 questionaire that the claimant had been unable to follow instructions since childhood. This does not explain how the claimant was able to engage in substantial gainful activity in 1980, 1981, 1983, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1996 and 1997 (Exhibit 3D, p.2). She only treated the claimant four times after he was apparently sober, and her treatment notes at that time indicate that the claimant was doing better. Dr. Haynes [sic] statements that she completed for purposes of the disability evaluation are not supported by her treatment notes. She made generalizations about the claimant's condition since childhood when she admittedly had a limited treatment relationship with him and only treated the claimant four times when he was not abusing drugs and alcohol. Additionally, Dr. Haynes did not address the fact that the claimant was frequently not compliant with treatment, a fact that her own treatment notes confirm. She did not discuss or analyze how the claimant had been able to work for many years, how he had friends that he did some work for, or how he was able to ride the bus with the significant social limitation she attributed to him. Dr. Haynes has indicated that the claimant has [sic] a bipolar disorder and a personality disorder since youth, but she apparently did not base this on any medical records, nor [sic] provide an explanation as to how the claimant was able to work for many years. I give the opinion of Dr. Haynes some weight, but, given its inconsistency in terms of substance abuse, consistency of treatment and the claimant's history of many years of work activity, as well as his successful completion of technical training, I do not find it persuasive.

Tr. 29.

Plaintiff argues that none of the reasons the ALJ provided for rejecting Dr. Haynes's opinions are persuasive. First, plaintiff asserts that because Dr. Haynes was Mr. Duda's treating psychiatrist, the ALJ could not discount her opinions on the basis that she had a limited treatment relationship with him, given that she was the only psychiatrist to treat him both while he was abusing drugs and alcohol and after he

---

[6]Accordingly, the undersigned rejects plaintiff's assertion that the ALJ erred by failing to adequately discuss Dr. Haynes's mid-July 2002 and late July 2004 assessmnents of Mr. Duda's mental impairments and functional limitations.

became sober, and thus was in the best position to evaluate the effect his substance abuse had on his ability to work. The point here, however, is that as noted by the ALJ, despite the evidence in the record that Mr. Duda's substance abuse continued at least through October 2003, and apparently thereafter in light of the manner of his death, Dr. Haynes was wholly unaware of his continued problems in that area, or at least she failed to note those problems in any of the opinions she provided. Further, while she may have had a treatment relationship with Mr. Duda over a period of time, the limited number of times overall in which she saw him does diminish her credibility here as well.

Accordingly, given the fact that Mr. Duda apparently continued to abuse alcohol and drugs during much of the time Dr. Haynes treated him, and she failed to indicate any awareness of this fact anywhere in the three opinions she provided, the ALJ properly discounted her conclusion that his mental impairments and limitations were not caused or otherwise affected by his substance abuse. See Batson, 359 F.3d at 1195 (ALJ need not accept treating physician opinion if it is inadequately supported by record as whole). Next, plaintiff asserts that because Mr. Duda only alleged he became unable to work in 1998, consideration of his ability to work prior thereto is inappropriate. But, again, the point here is that, at least with respect to the late January 2006 statement, the evidence the ALJ pointed to in the record showing that Mr. Duda was able to engage in work for some 13 years prior thereto wholly undermines Dr. Haynes' opinion that he suffered from mental functional limitations serious enough to prevent him from doing so, and that those limitations had been present since childhood.

Plaintiff also misses the point in arguing that he had worked at 34 different jobs during this period of time, as the issue here is not whether those jobs constituted substantial gainful activity for purposes of step one analysis, but whether the fact that Mr. Duda's ability to engage in work during all those years was in direct contradiction to the opinion of Dr. Haynes that he could not have done so. As explained above, it was, thereby discredited her opinion with respect thereto. Also as pointed out by the ALJ, furthermore, Dr. Haynes's opinion concerning Mr. Duda's mental condition prior to the period during which she treated him has no basis in either her own treatment notes or elsewhere in the record.

As noted above, the ALJ discounted Dr. Haynes's opinions as well on the basis that she only treated Mr. Duda four times during the period when he was clean and sober, and that her own treatment notes at the time indicated he was doing better. In regard to this finding, plaintiff merely asserts that the

fact that Mr. Duda did better when he was taking his bipolar medications, only shows that Dr. Haynes was correct to diagnose him with this disorder. The undersigned already has rejected plaintiff's reasoning here for the reasons discussed in the previous section. Also as discussed above, Dr. Haynes appeared to be wholly or largely unaware of the nature and extent of Mr. Duda's substance abuse during much of the period he was being treated by her. The fact that Mr. Duda did better during his period of sobriety, furthermore, indicates substance abuse had a far bigger impact on his functioning than opined by Dr. Haynes.

Plaintiff also misses the point that, as noted previously, while Dr. Haynes may have been the only psychiatrist to treat Mr. Duda, the lack of frequency with which she did so calls into question the reliability of her opinions regarding his impairments and limitations during that period. It is true, as plaintiff further asserts, that absent "evidence of actual improprieties," the purpose for which a medical report is obtained is not a legitimate basis for rejecting it. See Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1996) (examining doctor's findings entitled to no less weight when examination is procured by claimant than when obtained by Commissioner). However, although the ALJ pointed out the fact that it was procured for such a purpose, he did not actually appear to discount it on that basis. Even if the ALJ did improperly do so, as discussed herein, other valid reasons for discounting Dr. Haynes's opinions were provided.

Plaintiff also takes issue with the ALJ's statement that Dr. Haynes did not address the fact that Mr. Duda frequently was non-compliant with treatment. Plaintiff asserts the ALJ erred here by failing to acknowledge that when Dr. Haynes completed her late July 2004 assessment, Mr. Duda had been clean and sober for nine months, yet continued to experience serious symptomatology. Again, though, plaintiff fails to address the relevant issue here. While Mr. Duda may have maintained that level of sobriety at the time, as noted by the ALJ, Dr. Haynes's own treatment notes show that as of mid-June 2004, he had been off his medications "for quite a while." Tr. 457.

Back in late January 2004, though, Dr. Haynes found Mr. Duda to be doing well on his combination of medications. Tr. 458. Mr. Duda appeared to have gone back on his medications in early July 2004, with no really significant problems noted. Tr. 456. Indeed, Dr. Haynes signed off on the mid-September 2004 observation by treatment staff that Mr. Duda was "[r]esponding well to current medication," and that his bipolar disorder was in partial remission. Tr. 533-34. Mr. Duda himself,

furthermore, reported at the time that he was "mostly stable" and that now that he was "clean", he was "doing much better" (Tr. 533), thus indicating that, contrary to plaintiff's assertion, he did improve subsequent to stopping his substance abuse. The ALJ, therefore, did not err in so finding here as well.

Lastly, plaintiff argues the fact that Mr. Duda worked sporadically in the past or was able to ride the bus also was not a legitimate basis upon which to discount Dr. Haynes's opinions. However, as discussed above, Mr. Duda's past work history does directly contradict Dr. Haynes's opinion that mental functional limitations precluding the ability to perform work-related tasks at the competitive standards level had been present since his childhood. In addition, the fact that Mr. Duda was able to ride the bus – let alone share living space with others, do work with friends and have a friend accompany him to an evaluation – at the very least does call into question the significant limitations Dr. Haynes found he had with respect to social functioning, including in the ability to get along with others. Accordingly, the undersigned finds the ALJ did not err in rejecting the above opinions provided by Dr. Haynes.

B.    Dr. Gustavson

As noted above, the medical expert at the first hearing, Norman Gustavson, M.D., testified that the record supported diagnoses consisting of intermittent explosive behavior, rule out attention deficit disorder, an antisocial personality disorder, and polysubstance abuse, but that it contained no evidence of a bipolar affective disorder. Tr. 595-96. In addition, Dr. Gustavson testified that Mr. Duda had moderate limitations in his activities of daily living, moderate difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no decompensations of an extended duration. Tr. 596-97. Dr. Gustavson testified as well that Mr. Duda functioned independently, though he did struggle with and have problems in that area, and he disagreed with Dr. Haynes's opinion that Mr. Duda would not be able to meet "competitive standards" in regard to maintaining regular attendance and being punctual within customary tolerances, finding no evidence of any inability in those areas. Tr. 598-99.

Dr. Gustavson went on to testify that he did not know the basis for Dr. Haynes's opinion that Mr. Duda would be unable to complete a normal workday or workweek, and that while Mr. Duda had a serious limitation in his ability to work in coordination with others, it was not precluded. Tr. 599-600. On the other hand, Dr. Gustavson did testify that he would agree with Dr. Haynes that Mr. Duda would be unable

to meet competitive standards in regard to accepting instructions and responding appropriately to criticism from supervisors, and would not be able to meet "acceptable" standards in terms of getting along with co-workers or peers. Tr. 600. With respect to dealing with work stress, Dr. Gustavson testified that Mr. Duda again would have a serious limitation, but would not be precluded from doing so, and that he did not agree Mr. Duda would miss four days of work per month. Id.

Dr. Gustavson further testified that he did not believe testing in the record revealed Mr. Duda to be generally inadequate to the major tasks of life, such as work and relationships. Tr. 601. He also testified that if Mr. Duda stayed "drug free" and was "on medication," then "considerable improvement in his ability to adapt and behave in a regular way" would be expected. Id. In addition, Dr. Gustavson testified that testing showed Mr. Duda was "okay in all the cognitive areas," and that his "personality assessment" basically indicated "somebody who tends to be disinhibited under the influence of drugs and alcohol." Id. Dr. Gustavson testified as well, however, that he could not predict the extent to which Mr. Duda would be improved if alcohol and drug use was stopped. Tr. 603.

In his decision, the ALJ stated that he "relied heavily" on the opinion of Dr. Gustavson, which the ALJ considered to be "well reasoned and persuasive." Tr. 30. Plaintiff argues the ALJ erred by failing to explain why he did not then also accept Dr. Gustavson's opinion that Mr. Duda would be unable to meet competitive standards with regard to accepting instructions and responding appropriately to criticism from supervisors. The undersigned agrees. Although the ALJ did find Mr. Duda to be capable of performing work with only "limited supervision" (Tr. 32), it is not at all clear that this is the same thing as not being able to meet the competitive standards for dealing therewith, and, indeed, logically would appear to be much less restrictive than the limitation testified to by Dr. Gustavson. The ALJ, however, did not provide any explanation for this discrepancy, and to this extent he erred.

C.    Ms. Lovell, Mr. Karczewski and Ms. Dunbar

As noted above, in early June 2001, Annette Lovell, M.A., completed a psychological/psychiatric evaluation form, in which she diagnosed Mr. Duda with a bipolar disorder, along with a possible diagnosis of polysubstance dependence. Tr. 345. Ms. Lovell stated that neither of Mr. Duda's diagnosed conditions would have been affected by his alcohol or drug abuse, as he reported having "60 days of abstinence." Id. Ms. Lovell, however, did opine that alcohol or drug abuse caused Mr. Duda's symptoms "to become more

severe," especially his depression. Tr. 346. She found him to suffer from a number of marked and severe mental functional limitations, none of which were likely the result of substance abuse. Id. In addition, Ms. Lovell did not think mental health intervention was likely to restore or substantially improve his ability to work in a regular and predictable manner, as he had been in treatment and on medication "for many years," and he was only "[m]inimally better." Tr. 347.

Also as noted above, Po Karczewski completed a psychological/psychiatric evaluation form in late January 2005, as well, in which he diagnosed Mr. Duda with a bipolar disorder, and found him moderately to markedly limited in a number of functional areas, none of which, again, were felt to be the result of drug or alcohol abuse. Tr. 520-21. Unlike Ms. Lovell, though, Mr. Karczewski felt medication had a positive effect on Mr. Duda's symptoms, and believed mental health treatment likely would restore or substantially improve Mr. Duda's ability to work in a regular and predictable manner. Tr. 521-22. In mid-July 2003, a case staffing/consultation form was completed by Mary R. Dunbar, A.R.N.P., in which she diagnosed Mr. Duda with a bipolar disorder, polysubstance abuse and a GAF score of 35.

Plaintiff argues the ALJ erred in failing to fully discuss the findings and opinions from the above three mental health treating sources. The undersigned agrees in part. Defendant argues the ALJ did not have to mention, or indeed consider, Ms. Dunbar's findings, because GAF scores do not necessarily reflect a person's ability to work, and because the Commissioner does not use them in Social Security disability programs and dismisses the correlation between those scores and the severity requirements contained in the Listings. The courts, however, have found GAF scores to be "relevant evidence" of a claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). Therefore, while a GAF score "is not essential" to the accuracy of, say, the assessment of a claimant's residual functional capacity, it certainly may be "of considerable help" to the ALJ in regard thereto. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).

As noted above, "[a] GAF score of 31-40 is extremely low, and 'indicates . . . major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" Salazar v. Barnhart, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting DSM-IV-TR at 32). The GAF score Ms. Dunbar assessed Mr. Duda with, 35, falls right in the middle of that range, and thus is significant probative evidence that the ALJ should have at least given consideration to, even if ultimately he would not have been required to

have adopted it. Thus, while the ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity "standing alone" does not make the residual functional capacity assessment inaccurate, it is not clear the ALJ's failure to do so here with respect to Ms. Dunbar would have no impact ultimately on his determination of non-disability. Howard, 276 F.3d at 241.

Defendant further argues that the ALJ's failure to specifically address the limitations noted in Mr. Karczewski's evaluation report was harmless error, because he based those limitations on a diagnosis of bipolar disorder, which the ALJ properly found Mr. Duda did not have, and because Mr. Karczewski also indicated that mental health treatment likely would restore or substantially improve Mr. Duda's ability to work. Plaintiff argues, correctly, that these are *post hoc* rationales which the ALJ himself did not provide as reasons for not adopting the limitations found by Mr. Karczewski. See Pinto v. Massanari, 249 F.3d 840 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."). The undersigned also "cannot . . . confidently conclude that no reasonable ALJ, when fully crediting" those limitations, "could have reached a different disability determination." Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

As for the findings and limitations to which Ms. Lovell opined, the ALJ stated that while she found Mr. Duda disabled, she "did not indicate what impact the substance abuse had on this conclusion." Tr. 21. As noted by defendant, though, Ms. Lovell did indicate what impact she felt Mr. Duda's substance abuse had on his mental functional capacity, which apparently was none based on his report of being abstinent for the past 60 days. However, as discussed above, the record does not support that finding, since in late April 2001, Mr. Duda reported drinking an unknown amount of alcohol, consuming cocaine on a daily basis and doing heroin "two times a week." Mr. Duda also was noted to have been in violation of his probation due to drug and alcohol use, and in late April 2001, and early May 2001, he was noted to be detoxifying. The fact that Mr. Duda "relapsed" yet again just two months after Ms. Lovell completed her evaluation, further undermines her determination that substance abuse was not a contributing factor to his observed functional limitations during this period of time, contrary to the assertion plaintiff is now making. The ALJ thus did not err in evaluating Ms. Lovell's opinion here.

IV.     The ALJ's Step Three Findings

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.  However, "[a] generalized assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone).  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.") (emphasis in original).  However, "symptoms alone" will not justify a finding of equivalence. Id.  The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).

The ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not

meet or exceed Listings).  This is particularly true where, as noted above, the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

As noted above, the ALJ found that although Mr. Duda's mental impairments met the criteria of Listing 12.09, no Listing was met or equaled absent his substance abuse disorder.  Plaintiff argues that the findings and opinions of Dr. Haynes, Ms. Lovell, Ms. Dunbar, and Mr. Karczewsk concerning Mr. Duda's bipolar disorder and associated mental functional limitations support a finding that his mental impairments met or equaled  the criteria of Listing 12.04C(2), and that the ALJ erred in not adequately discussing or explaining why that Listing was not met or equaled.  As such, plaintiff asserts a determination of disability is required here at step three.  While the undersigned disagrees plaintiff has made the requisite showing of disability at this time, the ALJ did err here as explained below.

The criteria for meeting Listing 12.04C(2) are as follows:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

. . .

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

. . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate . . .

As discussed above, the weight of the medical evidence in the record supports the ALJ's findings regarding Mr. Duda's alleged bipolar disorder.  Also as discussed above, the ALJ did not err in rejecting the opinions of Dr. Haynes and Ms. Lovell.  On the other hand, again as discussed above, the ALJ's failure to properly analyze the findings and opinions of Mr. Karczewski and Ms. Dunbar did constitute error.  While it is not at all clear that those findings and opinions alone would support a determination of disability at step three of the sequential disability evaluation process, or, indeed, that the ALJ ultimately

1  will be required to adopt them, the ALJ's errors here – along with his errors in evaluating the testimony of

2  Dr. Gustavson regarding Mr. Duda's functional limitations – do warrant re-consideration of this step on

3  remand.

4  V.      The ALJ's Assessment of Mr. Duda's Credibility

5          Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d

6  639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749

7  F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is

8  based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a

9  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

10 long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

11 (9th Cir. 2001).

12         To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

13 the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must

14 identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

15 Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is

16 malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

17 Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v.

18 Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

19         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

20 evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

21 testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ

22 also may consider a claimant's work record and observations of physicians and other third parties

23 regarding the nature, onset, duration, and frequency of symptoms. Id.

24         The ALJ in this case found Mr. Duda's statements concerning his impairments and their impact on

25 his ability to work to be not entirely credible. Tr. 28. First, the ALJ noted that although Mr. Duda denied

26 working, he "did indeed work after his alleged onset date," which included "periods of working under the

27 table for friends and at Labor Ready," and which, the ALJ found, indicated "a level of vigor and stamina

28 inconsistent with disability." Id. Plaintiff argues this is a misrepresentation of what Mr. Duda testified to

   at the first hearing, at which he testified he did not believe he engaged in work subsequent to December

2001. See Tr. 576. Thus, plaintiff argues the fact that he worked occasionally and could not remember when he worked is not a convincing reason to discount his credibility.

Plaintiff's arguments here are without merit. While plaintiff focuses solely on Mr. Duda's hearing testimony, the ALJ's findings on this issue concerned his statements in general, including those contained elsewhere in the record. Thus, while Mr. Duda may not have remembered working after December 2001, the relevant point here is that the record overall shows he worked subsequent to his alleged onset date of disability, which supports the ALJ's finding that by so working Mr. Duda evidenced a level of vigor and stamina inconsistent with disability. For example, Mr. Duda himself testified at the hearing that he worked prior to December 2001, but after the date he alleged he became disabled. See id. In early October 2001, he reported that he "wanted" and "did obtain" a job (Tr. 337), and his mother noted he was "doing well" at the time and had "a job in Tacoma, [Washington]" as well (Tr. 313).

In early April 2003, Mr. Duda reported that he "went and helped someone move the other day," and that he "made some money doing it." Tr. 484. Apparently he considered himself to be capable of working at the time in that while he was waiting for a court hearing, he stated he "might get either 5 days in jail or 5 days work crew for this offense, let's hope it is work crew."[7] Id. In early May 2003, Mr. Duda reported that he was "tired of not having any money," and that he "would rather work." Tr. 482. The mental health counselor to whom Mr. Duda reported this, stated that he "made excuses about the change of management at Labor Ready and that being the reason why he could not try and find work through them." Id. In early July 2003, Mr. Duda reported "working side jobs and a couple of times with Labor Ready," and having "a job lined up, to help tear off a roof." Tr. 480.

Plaintiff argues, though, that just because Mr. Duda may have worked occasionally, does not mean this is a legitimate basis upon which to discount his credibility. But, again, the point is that his willingness and apparent ability to work, does impugn his credibility concerning his allegation that he was unable to do so as of his alleged onset date of disability. Plaintiff also argues Mr. Duda did not allege he was unable to work due to a lack of vigor and stamina, but because he had difficulty working around other people. Here too, however, plaintiff's argument fails, since, as noted above, on at least one occasion Mr. Duda expressed a desire to be part of a work crew instead of spending time in jail, and on another occasion

_____

[7]Mr. Duda also had reported back in late January 2000, that he had "hopes of working during the day," and "pursuing auto mechanics recertification at night." Tr. 262.

reported that he had helped someone else move and got paid for it. In addition, Mr. Duda told Dr. Campball in late January 2000, that his "work relationships" with co-workers had "been 'good'," and that he had "few problems" in a work setting except that he "missed a lot of days." Tr. 261. These instances thus show that Mr. Duda had at least some ability to work with others.

The ALJ found Mr. Duda's credibility to be further impugned because he had "a criminal history with several incarcerations." Tr. 28. Plaintiff asserts this is not a convincing reason to discount Mr. Duda's credibility. It is true that merely having a criminal history is not alone a legitimate reason for discounting a claimant's credibility. Indeed, defendant apparently agrees the ALJ erred here on the basis that Mr. Duda's criminal history involved no crimes of dishonesty. A review of the record, however, does show Mr. Duda had engaged in crimes involving dishonesty. For example, he reported having been arrested at the age of 18 for stealing a bicycle, for which he ultimately was convicted of larceny. Tr. 254, 291. He also reported being "caught stealing when he was 16," though he was not actually charged with theft at the time. Tr. 256. In late June 2001, however, Mr. Duda was noted to have a court date the following month "for possession of stolen property" (Tr. 319), and in late July 2001, he was noted to have "robbed a convenience store" (Tr. 317). Further, as discussed above, just prior to his death, it was discovered that Mr. Duda had "stolen an unknown quantity of Methadone." Tr. 539.

The ALJ discounted Mr. Duda's credibility in part because he had "not been honest in reporting his drug and alcohol abuse to his treating and examining doctors." Tr. 28. Plaintiff argues the ALJ erred here, because he cited only one example in the record of Mr. Duda doing so, which plaintiff asserts is not a valid reason for discounting his credibility. However, the fact that Mr. Duda was dishonest at all with regard to his drug and alcohol use, even if only on one occasion, still impugns his credibility in that it is evidence of a tendency to not tell the truth. The record, furthermore, contains more than just this one instance in which Mr. Duda was not completely honest concerning such use. As noted by the ALJ, Mr. Duda told Dr. Miller in late February 2001, that "[h]is last alcohol was 'months and months ago,'" and that he had never used "street drugs" (Tr. 290), when earlier just that month, he reported to one of his treatment providers that he had been drinking 12-24 beers and smoking crack cocaine daily, while acknowledging further previous use of marijuana and methamphetamines (Tr. 349).

Mr. Duda also told Dr. Miller at the time that he had not been using illicit drugs or alcohol when he had committed the crime for which he was last incarcerated and denied "any alcohol-related charges" (Tr.

291), while previously Dr. Campbell noted that this same criminal offense was "the latest of an apparently long-line of alcohol and substance-related offenses" (Tr. 271). As discussed above, furthermore, Mr. Duda has been notably inconsistent and contradictory in the reports he has made over time to various treatment and examining medical sources regarding the nature, extent and frequency of his substance use and abuse. For example, while he admitted to "drinking alcohol recently" in early April 2001, he minimized the amount. Tr. 353. He told Dr. Ruddell in early March 2002, that he last drank alcohol back in the summer of 2000 (Tr. 428), which again directly contradicts what he reported in early February 2001. Accordingly, the ALJ did not err in discounting Mr. Duda's credibility for this reason as well.

The ALJ also discounted Mr. Duda's credibility in part based on evidence in the record suggesting Mr. Duda had exaggerated his symptoms and limitations. Tr. 28. Plaintiff argues the ALJ's citation to this evidence, contained in Dr. Ruddell's evaluation report, does not actually support a finding that Dr. Ruddell suggested Mr. Duda had done so. Again, the undersigned disagrees. Dr. Ruddell expressly stated that she "was concerned that he may exaggerate difficulties and attempt to 'con' or manipulate." Tr. 428. Although this statement by Dr. Ruddell does not necessarily show she believed Mr. Duda actually had done so, at the very least she clearly felt he was likely to engage in such behavior. This too then is a valid basis on which the ALJ could rely to find Mr. Duda less than fully credible.

Plaintiff further takes issue with the ALJ's statement that the record showed Mr. Duda "functioned adequately when he was consistent with the medications and was clean and sober," and that he "tended to deteriorate when he stopped his medications and/or relapsed." Tr. 28. Specifically, plaintiff argues that while it is clear Mr. Duda functioned better when clean and sober and when taking his medication, this is not a valid reason to reject his testimony concerning those symptoms that still remained. But plaintiff does not point to what those remaining symptoms were, let alone that they necessarily rose to the level of being disabling. The record, furthermore, supports the ALJ here.

An ALJ may discount a claimant's credibility on the basis of medical improvement. See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). In early November 1998, Mr. Duda's mental status was noted to be "'within normal limits' and 'stable on treatment.'" Tr. 263, 287. When asked by Dr. Campbell in late January 2000, why he had not been able "to get ahead and/or pull his life together," Mr. Duda responded that "[a] lot of that was alcohol[,] . . . drinking." Tr. 259, 270. Mr. Duda himself told Dr. Campbell that he experienced "an

increase in anxiety, depression and stress" when he went of his medications. Tr. 264. Dr. Campbell thus recommended that "[m]edication compliance should be an ongoing requirement," as Mr. Duda appeared "to do much better when medicated." Tr. 271.

In early February 2000, Mr. Duda stated that Lithium was "working well for him," and he thought that his medications had "helped" him. Tr. 275. In mid-July 2000, Mr. Duda told Ms. Lovell that he felt his medications had "evened out his mood." Tr. 243. In late July 2000, he was reported to be doing well on his medications. Tr. 250. Mr. Duda reported in mid-April 2001, that a number of his medications were helping (Tr. 326), in late May 2001, that he was "doing better" with a medication increase (Tr. 320), in late June 2001, that he was "[d]oing well" and "[d]oing a little better" on those medications (Tr. 319, 351), and in early December 2001, that Lithium had been "helpful in the past" (Tr. 467).

In early January 2002, Mr. Duda stated that his medications made him feel "much better," that because of them he did not "really have any problems" and that he "just need[ed] to keep on" them. Tr. 414. In early March 2002, he restarted his Lithium secondary to being depressed off of it "for a time" (Tr. 463), and later that month he again reported that he did not "really have any problems" because he was on his medications, and that he just needed "to stay on" them (Tr. 489).

In late July 2002, Mr. Duda reported that he was "[d]oing better" with the addition of another drug, and was "[n]ow able to sleep." Tr. 459-60. In late October 2002, he reported his mood swings were only "mildly controlled" on his current medications, but in early November 2002, his mental health counseling services were "closed" after he decided that "all he needed was medication management." Tr. 488, 490. In late January 2003, and again in mid-July 2003, Mr. Duda stated that crises will "usually" happen for him when he does not take his medications and when he is "on other drugs." Tr. 473, 475. In late September 2003, he once more reported that his medications "helped". Tr. 468.

In late January 2004, Mr. Duda was noted to be "[d]oing well" on a combination of medications. Tr. 458. He reported "doing okay" and being "mostly stable" in late January 2005, and was deemed to be "[r]esponding well to current medication" for the most part. Tr. 527. Mr. Duda was reported to have been off his medications "for awhile" in late June 2005, and he was diagnosed as having a "[m]ild exacerbation" of his symptoms as a result thereof. Tr. 525. The record, therefore, is replete with reports that when on his

medication and clean and sober, Mr. Duda saw significant improvement in his symptoms and functioning.[8] Accordingly, for this reason too the ALJ did not err in discounting Mr. Duda's credibility.

The ALJ discounted Mr. Duda's credibility as well because he had been "non-compliant with medications and treatment." Tr. 28. Plaintiff argues this is not a valid reason for doing so, though, with respect to the symptoms he continued to experience even when clean and sober and medically compliant. However, as discussed above, the record does show significant medical improvement which the ALJ did not err in relying upon to discount Mr. Duda's credibility. Further, failure to assert a good reason for not seeking or following a prescribed course of treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). The record clearly indicates such non-compliance in this case.

In late December 1999, Mr. Duda was discharged from a chemical dependency treatment program "due to non-compliance." Tr. 263. In late January 2000, he told Dr. Campbell he "was either sporadically or not taking his medications since" having been "incarcerated until 10/20/99," and had "started back on them at that time as he needed 90 days of medication compliance in order to be accepted at Work Release." Tr. 264. In terms of his level of motivation for treatment, Dr. Campbell observed that testing indicated Mr. Duda's was "somewhat lower than is typical," that "[h]is responses" suggested he was "satisfied with himself" as he was, that he was "not experiencing marked distress," and that as a result he saw "little need for changes in his behavior." Tr. 268.

In early July 2000, Mr. Duda reported that he was not able to take his medications when he was "in the community" because he could not afford them, and that he took his medications when he did "not have to pay for them." Tr. 251-52. In late July 2000, however, Mr. Duda reported that he had been following his medications and doing well on them. Tr. 250. He reported in mid-August 2000, that he had "never been able to afford his medications while living in the community." Tr. 247. In early October 2000, Mr. Duda reported being without his medications "for several months." Tr. 249. Later that month, once more he was noted to have been "non-compliant" with "all" treatment. Tr. 235. In early February 2001, "lack of

---

[8]Plaintiff argues that the fact that Mr. Duda functioned better while taking his medications would appear to support Dr. Haynes's opinion that Mr. Duda had a bipolar disorder. As explained above, however, the mere fact that Mr. Duda was prescribed a medication – apparently only one among several – that may commonly be used to treat that disorder does not alone establish Mr. Duda actually suffered therefrom. In any event, the point is that the record supports the ALJ's finding of medical improvement here, which is a valid basis for discounting a claimant's credibility.

follow through" concerning his treatment was noted as well. Tr. 342.

In late February 2001, Mr. Duda reported "noncompliance due to difficulties with theft arising from his homeless lifestyle." Tr. 290. In early March 2001, he was noted to have "not followed through" with "getting into treatment." Tr. 333. It was noted in late April 2001, and again in early May 2001, that Mr. Duda had "a tendency to take" his medications "off and on alternately with doing drugs," and that he had "[p]retty low compliance" with his medications. Tr. 355-56, 358-59. In late June 2001, Mr. Duda reported that he stayed out "all weekend," but that he did not take his pills with him. Tr. 319. In early July 2001, plaintiff was told that if Mr. Duda did "not show" for treatment by the end of the month, his case would be closed, and that he had "not been in" for his medications "since June." Tr. 314.

In late September 2001, Mr. Duda was noted to not be taking his medications. Tr. 381. While Mr. Duda was seen for an acute exaggeration of asthma shortly thereafter, he "refused" a nebulizer, because he stated he was "late for work" and needed "to go." Tr. 379. Again, it was noted in early October 2001, that he had not been seen for medications since June 2001, and that he had not been seen for counseling since August 1, 2001. Tr. 313, 337, 339. Accordingly, his case was closed at that time. Tr. 313. He reported in early December 2001, that he last was on his medications six months ago, and admitted he was discharged from treatment "due to poor contact." Tr. 418, 467.

In early March 2002, Mr. Duda stated that he had "[s]topped Lithium for a time," and that while he had restarted taking his medications the previous week, he was "not real consistent" in doing so. Tr. 463. Also in early March 2002, Mr. Duda told Dr. Ruddell that although he did have a prescription for Lithium, "some days" he did not take it. Tr. 427. He further stated he had not obtained his prescriptions, because he did not want to leave his house, but Dr. Ruddell herself noted this was "not consistent with [the] records." Id. It was noted as well that while Mr. Duda had "applied for GAU benefits several times," records indicated his applications had been "denied, apparently for lack of cooperation with services." Id. In late April 2002, he again reported being off his medications and "not consistent" in taking them. Tr. 462.

In early July 2002, Mr. Duda reported having taken his Lithium for only the past two weeks. Tr. 460. It was noted in early January 2003, that while Mr. Duda had been assessed for mental health services in early November 2002, he "was closed after he decided that all he needed was medication management." Tr. 488. In early March 2003, mental health treatment staff noted Mr. Duda "showed no ambition while involved with the program." Tr. 485. In early April 2003, it was noted that it was unclear whether he was

taking his medications, as he would have been out of them the previous month, but no refills appeared to have been requested. Tr. 507. In mid-June 2003, Mr. Duda reported that his medications had run out "a week ago" but had "been o.k. without" them, that he had been "skipping a day here and a day there" in regard to his medications, and that he had "not been going to any meetings." Tr. 481. It was noted that if he missed his follow-up appointment, his case would "be submitted for closure." Id.

Mr. Duda was noted to have been "cooperative with treatment recommendations" in early July 2003, and in mid-July 2003, to have "maintained consistent med[ication] compliance while living in a structured environment." Tr. 470, 480. However, in early September 2003, his case was "submitted for closure," because he had not attended scheduled medication appointments as his treatment prescriber had recommended. Tr. 478. Later that month, it was noted that he had "not been seen by a prescriber for over 90 days" or had any contact with his case manager "in the same amount of time," and that his case indeed was closed due to inactivity. Tr. 468, 477. It also was noted that if he "were to return for services, particular attention should be considered" concerning "his investment in recovery." Tr. 468.

In early June 2004, Mr. Duda reported being "off Zoloft for quite a while," but in early July 2004, he reported having taken his medications "regularly". Tr. 456-57. In late July 2005, while it was noted that Mr. Duda was "[m]otivated to continue treatment," he again reported that he had "been out of medications for awhile," and that he had not "taken the Lithium for a week." Tr. 525. Thus, although there is evidence in the record that Mr. Duda at times was compliant with taking his medications, and that other at times he may have had difficulty gaining access thereto due to a lack of financial resources, it seems the majority of the time he failed to follow through on recommended treatment. The undersigned, therefore, did not err in discounting his credibility here.

Lastly, the ALJ discounted Mr. Duda's credibility for the following reason:

> The claimant has described daily activities, which are not limited to the extent one
> would expert [sic], given the complaints of disabling symptoms and limitations. He
> used public transportation, cooked, vacuumed, did the laundry as well as the dishes,
> maintained his trailer where he lived, walked his dog and attended AA meetings. The
> claimant's activities of daily living, such as watching television, handling his own
> finances, reading, taking on temporary jobs, helping a friend move, and attending
> classes is evidence of ability to concentrate (Exhibits 4E, 9E, testimony). Moreover,
> such robust activities of daily living may not be directly comparable to the world of
> work, however, are indicative of an ability to persist in goal directed activity when
> needed and to persevere at it. . . .

Tr. 29. Plaintiff argues that none of these activities are inconsistent with Mr. Duda's testimony regarding

his symptoms and limitations, and thus are not a convincing reason for rejecting it. Specifically, plaintiff asserts that none of the above activities show that Mr. Duda was able to adequately deal with co-workers and supervisors, or that he was able to perform competitive work on a sustained basis. The undersigned disagrees.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id. While not all the activities the ALJ listed above are indicative of an ability on Mr. Duda's part to deal with co-workers and supervisors, others are. For example, the record, as noted by the ALJ and discussed above, contains evidence of Mr. Duda having been able over the years to work and be with others. In addition, the ALJ did note activities engaged in by Mr. Duda which evidence an ability to persist and persevere in goal-directed activities as needed. The ALJ, therefore, also did not err here.

VI.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff, Mr. Duda's mother, submitted two statements, in which she described Mr. Duda's mental health and treatment history. Tr. 222-24, 226-27. The ALJ stated in relevant part with respect thereto that:

> . . . The close relationship between the witness and the claimant cannot be ignored in deciding how much weight the statement deserves. Although considered, this statement is not accorded significant weight. . . . [T]he claimant's mother lives in Massachusetts and did not have physical contact with the claimant during the period at issue. While she describes significant emotional problems that the claimant had while growing up, she indicated that when the claimant stayed on medication and got treatment, he was okay (Exhibit 13E, p.2). She would not have had any first hand knowledge concerning the claimant's substance abuse.

Tr. 29. Plaintiff first argues the fact that there was a close relationship between Mr. Duda and herself is not a proper reason for rejecting her statements. In so arguing, plaintiff cites <u>Bruce v. Astrue</u>, 557 F.3d 1113 (9th Cir. 2009), in which the Ninth Circuit noted that "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition." <u>Id.</u> at 1116 (quoting <u>Dodrill v. Shalala</u>, 12 F.3d 915, 1918-19 (9th Cir. 1993)).

It seems, however, that there may be a direct conflict in this Circuit concerning this issue. As the Ninth Circuit noted in <u>Bruce</u>, just two years earlier, it held that the ALJ had "permissibly rejected the claimant's ex-girlfriend's testimony in part because of her close relationship with the claimant and desire to help him influenced her." <u>Id.</u> at 1116 (citing <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006)). The Court of Appeals in <u>Bruce</u>, nevertheless, did not explain why it was permissible to reject lay witness evidence on this basis in one case, but not the other. The only explanation the undersigned can glean from reviewing these two cases, is that in <u>Greger</u> there appears to have been at least some evidence – although the Ninth Circuit did not discuss exactly what that evidence was – of the lay witness "possibly" being "influenced by her desire to help" the claimant in addition to the "close relationship" she had with him (464 F.3d at 972) – while in <u>Bruce</u>, no such evidence existed.

Because there is no such evidence in this case as well, the undersigned finds the fact that there may have been a close relationship between plaintiff and Mr. Duda alone did not justify the ALJ in rejecting his mother's statements on this basis. Plaintiff next asserts the fact that she did not have any physical contact with Mr. Duda during the period at issue in this case also is not a proper basis for rejecting her statements, pointing out that she talked with him on the telephone every two weeks, and that the ALJ himself conceded she certainly had knowledge of the significant emotional problems he had growing up. But it is proper for an ALJ to take into consideration when evaluating lay witness testimony, the nature of the contact between that witness and the claimant. <u>See</u> <u>Dodrill</u>, 12 F.3d at 918-19 (finding family members who are in position to observe claimant's symptoms and daily activities are competent to testify). In addition, the extent of Mr. Duda's emotional problems during childhood bears little relevance for purposes of determining eligibility for disability benefits to his mental condition during the period of alleged disability.

Without any explanation as to why she believes it to be so, plaintiff asserts it was not proper for the ALJ to reject her observations concerning Mr. Duda's limitations on the basis that she noted he was

"okay" when he stayed on his medications and got treatment. But certainly this statement of plaintiff's constitutes evidence that Mr. Duda could function adequately when appropriately treated and when in compliance with his prescribed medications. The undersigned also finds no error in the ALJ's statement that plaintiff would not have any first hand knowledge concerning Mr. Duda's substance abuse. While she apparently did have at least some knowledge of Mr. Duda's habit of self-medicating, there is no indication in her statements as to the time period she was referring to here, or as to whether she was aware of the extent of his alcohol and drug abuse during the relevant time period. Finally, the fact that Mr. Duda's mental impairments may still have been present and causing significant functional limitations according to Dr. Haynes, does not bear on the credibility of plaintiff's own observations of Mr. Duda's functioning.

VII.    The ALJ's Assessment of Mr. Duda's Residual Functional Capacity

        If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

        A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

        Here, the ALJ found that absent his substance abuse disorder, Mr. Duda had the residual functional capacity to perform "work at all exertional levels," which required "no public contact, limited contact with coworkers and limited supervision." Tr. 32. Plaintiff argues that RFC assessment cannot be upheld in light of the medical evidence in the record provided by Dr. Haynes, Dr. Gustavson, Ms. Lovell, Ms. Dunbar, and Mr. Karczewski, Mr. Duda's testimony regarding his symptoms and limitations, and her own observations of his functioning. As discussed above, though, the ALJ did not err in evaluating the findings

1  and opinions of Dr. Haynes or those of Ms. Lovell, or in assessing the credibility of Mr. Duda or plaintiff's

2  lay witness statements.  On the other hand, also as discussed above, the ALJ did not properly evaluated the

3  testimony of Dr. Gustavson or the findings and opinions of Ms. Dunbar and Mr. Karczewski.

4  Accordingly, it is not at all clear the ALJ's assessment of Mr. Duda's RFC is completely accurate.

5  VIII.  The ALJ's Step Five Analysis

6      If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

7  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

8  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), §

9  416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

10 Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

11 v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

12     An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

13 posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

14 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

15 medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

16 Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

17 by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

18 that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

19 Cir. 2001).

20     In this case, the ALJ posed a hypothetical question to the vocational expert at the first hearing

21 containing functional limitations substantially similar to those included in the assessment of Mr. Duda's

22 residual functional capacity. Tr. 605.  In response to that hypothetical question, the vocational expert

23 testified that there were other jobs an individual with those limitations and the same age, education and

24 work experience as Mr. Duda could do. Id.  Based on the vocational expert's testimony, the ALJ found Mr.

25 Duda to be capable of performing other jobs existing in significant numbers in the national economy, and

26 therefore not disabled at step five of the sequential disability evaluation process. Tr. 31-33.

27     Plaintiff argues that given the ALJ's errors in evaluating the medical and lay witness evidence in

28 the record, and in assessing Mr. Duda's credibility, the hypothetical question the ALJ posed to at the first

hearing has no evidentiary value.  The undersigned agrees that in light of the ALJ's errors in evaluating the

medical evidence in the record and in his assessing Mr. Duda's residual functional capacity, it also is not certain the hypothetical question the ALJ posed to the vocational expert contains all the mental functional limitations supported by the record. The undersigned disagrees, however, that the record only supports a finding that Mr. Duda is unable to perform full-time competitive work on a consistent basis at this time, or that he is necessarily disabled in light of the ALJ's errors. Rather, as explained below, remand for further administrative proceedings is warranted.

IX.     This Matter Should Be Remanded for Further Administrative Proceedings

        The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

        Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

        (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical evidence in the record concerning Mr. Duda's mental functional limitations, his residual functional capacity and his ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative hearings.

        It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). Further, "[i]n cases

where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." <u>Bunnell</u>, 336 F.3d at 1116.

Plaintiff argues that because the ALJ erred in evaluating the findings and opinions of Dr. Haynes, Ms. Lovell, Ms. Dunbar, and Mr. Karczewski, those findings and opinions must be credited as true. Here, however, the only treating or examining physician among these four medical sources is Dr. Haynes, and, as discussed above, the ALJ did not err in discounting her findings and opinions. Nor must Dr. Gustavson's testimony necessarily be credited as true, since he too is not a treating or examining physician. In addition, as discussed above, given the conflicting and ambiguous nature of the medical evidence in the record, it is not at all clear the ALJ would be required to find Mr. Duda disabled anyway. As such, remand here to re-consider that evidence and the other issues noted herein is proper.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 31, 2009**, as noted in the caption.

DATED this 6th day of July, 2009.

Karen L. Strombom
United States Magistrate Judge